ISAACS *v.* JONAS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 142.   Argued March 14, 15, 1892. — Decided April 10, 1892.

Cigarette paper, of suitable size and quality to be used in making cigarettes, and pasteboard covers therefor, of corresponding size, imported separately and entered together with the intention to combine them with paste into cigarette books for the use of smokers, are subject to a duty of seventy per cent *ad valorem* as "smokers' articles" under schedule N, and not to a duty of fifteen per cent *ad valorem* as "manufactures of paper" under schedule M, of the Tariff Act of March 3, 1883, c. 121.

THIS was an action brought December 17, 1885, by Isaacs against the collector of the port of New Orleans, to recover back an alleged excess of duties paid, under protest, upon twenty-five cases of cigarette paper, and upon twenty-three cases of pasteboard covers for cigarette paper, both imported by the plaintiff in June, 1885; the paper at the port of New Orleans, and the covers at the port of New York and thence transferred in bond to New Orleans; and the two entered by the plaintiff simultaneously at New Orleans for withdrawal for consumption.

The collector, and the Secretary of the Treasury on appeal, held both importations to be subject to the duty of seventy per cent *ad valorem*, imposed by schedule N of the Tariff Act of March 3, 1883, c. 121, on "pipes, pipe bowls, and all smokers' articles whatever, not specially enumerated or provided for in this act."   22 Stat. 513.

The plaintiff contended that both importations were within schedule M of the same act, imposing a duty of fifteen per cent *ad valorem* on "paper, manufactures of, or of which paper is a

component material, not specially enumerated or provided for in this act." 22 Stat. 510.

At the trial before a jury, it was agreed by the parties, without contention, "that the paper, when imported, was cut into small pieces of the size proper for making cigarettes, and was put up in packages wrapped in paper, the packages being about six or eight inches square, and that these packages were again enclosed in large cases or boxes for sea transportation; that the contents of each of the smaller packages referred to were made up of said small pieces of paper, cut to the size proper and of the proper character of paper for making cigarettes; that said cigarette paper, as imported, was in no manner attached together in any form of binding, but was separated into divisions of about 250 pieces of paper, by the interposition of a piece of paper of a different color, cut of the same size, so that it subdivided the paper into the divisions of the proper size and number of leaves for the contents of the book of leaves of cigarette paper, of the ordinary size of such books as sold in the markets."

The plaintiff introduced evidence "tending to show that the paper of which the small cut papers were made was made of a peculiar material, and by a process fitting it to be used as wrappers for cigarettes; and that the paper was manufactured in large sheets, and afterwards cut into the form of small pieces of paper as imported, before importation, by machines contrived for that purpose; that the paper was so cut to adapt it to use as wrappers for cigarettes; that cigarettes, as manufactured, consist of a small quantity of disintegrated tobacco leaves, wrapped about and held in place by the paper, and that in consumption both the tobacco and the paper are set on fire and both consumed or smoked by the smoker; that it was the intention of the plaintiff, at the time of importation, and his motive in making said importation in said form, to manufacture the said material into what are known as cigarette books; that the process of such manufacture is to separate the paper, as imported, where the colored leaves or subdivisions are located in the paper as imported, and with a brush cover one edge of the paper with flour paste, glue, or some adhesive cement

adapted to cement leaves together at one edge, and then cement the paper into the covers as they are imported; that as to and concerning this particular importation a large portion thereof was so put up and cemented into books by the plaintiff after the same came into his possession by withdrawal and payment of duties; that this was done at the expense of about $400 for hire of workmen to do the work; that a portion of the paper as imported was sold directly to manufacturers of cigarettes, to be used in their factories in making cigarettes for sale as a manufacture and article of commerce; that as to this particular kind or manufacture of paper the plaintiff was the sole importer thereof into the United States, by special arrangement with the foreign manufacturers thereof; that as an article of retail sale, or jobbing and sale to the retail dealers, the paper has always been sold in this country in the form of books consisting of a certain number of leaves of the paper, cemented together and to the cover; and that in use thereof by the smoker the leaves are separately torn from the book used in the manufacture of cigarettes by the smoker, and when the leaves are all expended the cover is thrown away as useless; that the function of the cover is simply to protect the leaves from becoming scattered or injured by being handled or carried in the pockets of the smokers, and had no other function or use." The plaintiff thereupon rested his case.

The defendant called as a witness a person connected with the office of the appraisers at the custom house in New Orleans, who testified that for many years he had been a cigarette smoker, rolling and making his own cigarettes by combining the tobacco and paper himself; and who produced packages of cigarette paper of another kind and greater stiffness than the goods imported, bought at cigar shops in New Orleans, without covers, and held in place as a package by a flexible band; and was permitted by the court, against the plaintiff's objection and exception, to testify that those packages could be used by smokers in the condition in which they were produced, and also that "it was possible to use the paper in controversy in this case in the form in which it was imported, without pasting

together the edge, or pasting or gluing the paper to connect the cover to make a cigarette book."

The bill of exceptions set forth many instructions requested by either party and given by the court with modifications, as well as other instructions given to the jury, the substance of all which sufficiently appears by the following instructions given, to each of which the plaintiff excepted:

" If you find that the smoker himself, by simply placing the package of small leaves of cigarette paper within the cover, and placing the rubber band which adheres to the cover around the cover and the package of small leaves of cigarette paper, can use the book of cigarette paper for all the purposes to which a book of cigarette paper is put by smokers, then the jury should find for the defendant."

" To find that the things imported are smokers' articles, the jury must find that they are ordinarily and distinctively used by smokers in or in connection with smoking, and that they are ready to be so used."

" If the merely laying them together enables the smoker to use them, and he did use them without any process except that of laying them together, they would be smokers' articles; but if, on the other hand, there was a process of manufacture or combination beyond laying together, then they would be materials for smokers' articles, and not smokers' articles."

" If the jury find that the things separately imported are imported separately as matter of business, and not as an evasive device, then they are the materials for the articles, but not the articles themselves; but if the jury find the things, though imported separately, were designed, without any expenditure beyond being put together, to be put and sold together, and were imported separately, merely to escape a higher rate of duty, and not from motives of business, then the separate things are to be classed as parts of a whole, and not simply as materials."

The jury returned a verdict for the defendant, upon which judgment was rendered; and on May 16, 1889, the plaintiff sued out this writ of error.

*Mr. W. Wickham Smith,* (with whom were *Mr. Charles Curie* and *Mr. D. Ives Mackie* on the brief,) for plaintiff in error.

*Mr. Assistant Attorney General Parker* for defendant in error.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

Had there been any question in this case necessary for the consideration and decision of a jury, the plaintiff would have no just ground of exception to the admission of the testimony of an habitual cigarette smoker, accustomed to roll his own cigarettes, that other cigarette paper, sold in similar packages but without covers, could be used by smokers in that condition, and that the pieces of paper now in question could be so used without being pasted together or into a cover; or to the instructions under which the case was submitted to the jury.

But the several exceptions taken become immaterial, because upon the plaintiff's own case the jury might well have been instructed, as matter of law, that the defendant was entitled to a verdict.

The facts which were either admitted by both parties, or which the evidence introduced in behalf of the plaintiff tended to prove, were in substance as follows: The importation of cigarette paper consisted of packages of separate pieces of a paper made of a peculiar material and by a special process, suitable to be used as wrappers for cigarettes, cut into the proper size, and separated into divisions of about 250 pieces by the interposition of pieces of paper of the same size and of different color. The other importation consisted of pasteboard covers of corresponding size, to be used with the paper in making cigarette books, by brushing one edge of each subdivision of the paper with paste or other adhesive substance, and then cementing the paper into the covers, from which the leaves are torn by the smoker as desired, and then the cover (which is useful only to protect the papers) is thrown away.

The plaintiff, by arrangement with the foreign manufacturers of this paper, was the sole importer thereof into the United States; his intention and motive in importing it were to make it up into cigarette books; and that was the only form in which such paper had been sold at retail. A large part of this importation was so made up into books by the plaintiff, at an expense of about $400 for the hire of workmen; but a part of it, as imported, was sold directly to manufacturers of cigarettes.

The question is, whether upon these facts the cigarette paper and the pasteboard covers for it were "manufactures of paper," within schedule M, or were "smokers' articles," within schedule N, of the Tariff Act of 1883.

Each of the two clauses containing the words "not specially enumerated or provided for in this act," and the clause concerning smokers' articles being the more specific and definite, this clause must of course prevail over the other in the case of a subject falling within both descriptions.

It is manifestly not requisite, in order to bring an article under this clause, that it should, of and by itself, be capable of being used for smoking; for the clause includes not only "pipes," which are ready to be filled and smoked, but "pipe bowls," which cannot be smoked without putting stems to them, "and all smokers' articles whatever."

In the case at bar, the cigarette papers, as well as the covers to hold them, were made, adapted and intended to be used by smokers in rolling and smoking cigarettes. The plaintiff himself imported both the papers and the covers, and entered and paid the duties upon the two simultaneously; and his intention at the time of importing them, as well as his motive in importing them in the form that he did, was to combine them into cigarette books for the use of smokers. The leaves of paper were fit for nothing else but to be made into cigarettes, and smoked with the tobacco wrapped in them; and they were used in the same way, whether never put into a cover at all, or first pasted into a cover and afterwards torn out one by one. The covers were fit for nothing, except to hold and protect the papers until made by the smoker into cigarettes. The mere pasting together of

the papers and the covers was in no proper sense a process of manufacture, and did not change the use or the character of the articles.

To decide that these cigarette papers and their covers, or either of the two, are not "smokers' articles;" would contravene the plain language, as well as the manifest intent and purpose of the Tariff Act.

The cases of *Robertson* v. *Gerdan*, 132 U. S. 454, and *United States* v. *Schoverling*, 146 U. S. 76, cited for the plaintiff, went no further than to hold other provisions of the Tariff Act, describing a complete instrument, to be inapplicable to the importer of a part thereof only. In *Robertson* v. *Gerdan*, the point decided was that ivory keys, sold to manufacturers of pianos and organs, to be scraped and glued to the wood, were not themselves musical instruments. In *United States* v. *Schoverling*, the point decided was that gunstocks, although intended to be put with barrels to form complete guns, yet no question of the importation of gun barrels being involved, were not guns; and there was no intimation that if the stocks and barrels had both been imported by the same person and entered at the same time, with the intention of himself putting them together as guns, they would not have been dutiable as such; or that gunstocks should not be considered as gunners' or sportsmen's articles.

*Judgment affirmed.*